**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| ASCEND PERFORMANCE MATERIALS OPERATIONS LLC,<br><br>           Plaintiff,<br><br>    v.<br><br>UNION PACIFIC RAILROAD COMPANY, BNSF RAILWAY COMPANY, CSX TRANSPORTATION, INC, and NORFOLK SOUTHERN RAILWAY COMPANY,<br><br>           Defendants. | **JURY TRIAL DEMANDED**<br><br>Civil No. _____ |

## COMPLAINT

Plaintiff Ascend Performance Materials Operations LLC, formerly known as Ascend Performance Materials LLC ("Plaintiff"), complains as follows:

### NATURE OF THE ACTION

1. This is an antitrust action charging the four largest United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act.

2. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (collectively, "Defendants") conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States by imposing uniform rail fuel surcharges. A rail fuel surcharge is a separately-identified fee above and beyond the base rate for transportation and is charged by the railroads purportedly to compensate for increases in the cost of fuel ("Rail Fuel Surcharge"). Through their collective action, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' actual fuel costs, and thereby collected millions, if not billions, of dollars of additional profits during the conspiracy period, including millions of dollars in additional revenue from Plaintiff in this case.

3. Defendants' conspiracy has been the subject of class action litigation for several years. *See In re Rail Freight Fuel Surcharge Antitrust Litig. (Rail Freight)*, 292 F. Supp. 3d 14

**COMPLAINT**                Page 1 of 21

125742415v1

(D.D.C. 2017).   While denying class certification, the U.S. District Court for the District of Columbia, noted that the "documentary evidence is strong evidence of conspiracy and class-wide injury."   *Id.* at 32.   The Court found that the "evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges" was "substantial."   *Id.* at 102. In particular, the Court found that there was "substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers."   *Id.* at 103.

4.     Defendants' imposition of uniform Rail Fuel Surcharges faced a significant hurdle because Defendants already had a well-established and reliable mechanism for recovering their fuel costs.   As of 2003, the vast majority of rail freight transportation agreements included rate escalation provisions based on an index called the All-Inclusive Index ("AII"), which weighted a variety of cost factors, including fuel.   The AII already permitted full recovery by the railroads of actual fuel cost increases, no matter how large.

5.     Defendants, however, orchestrated a scheme to remove fuel as a factor from the AII, thus allowing them to impose separate, stand-alone Rail Fuel Surcharges.   A railroad trade organization called the Association of American Railroads ("AAR") published the AII. Defendants controlled and dominated the AAR, and the CEOs of each Defendant were members of the AAR's board.   Through their collective action, Defendants caused the AAR to publish a new cost escalation index called the All-Inclusive Index Less Fuel ("AIILF") that did not include a fuel component.

6.     The AAR's adoption and publishing of the AIILF as a result of Defendants' collective action paved the way for Defendants' widespread implementation of new Rail Fuel Surcharges.   Defendants deployed these Rail Fuel Surcharges systematically, aggressively, and uniformly.   These Rail Fuel Surcharges were based on mutually agreed formulas that allowed Defendants to charge identical surcharge rates month after month.   As the District Court noted, "the evidence shows that defendants employed these fuel surcharges in lockstep" and "sought to apply fuel surcharges to as many customers as possible."   *Rail Freight*, 292 F. Supp. 3d at 104.

**COMPLAINT**

125742415v1

These new "fuel surcharges" were not tied to the actual cost of fuel and, instead, were calculated as a percentage increase on the total base rate of freight transportation, allowing the "fuel surcharges" to function as an across-the-board increase on freight prices.

7.      As a direct and proximate result of Defendants' price fixing conspiracy, Defendants restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff in its business and property.  Plaintiff paid a higher price for unregulated rail freight transportation than it would have paid absent Defendants' concerted unlawful activity.  Plaintiff spent millions of dollars on rail transportation provided by Defendants from 2003 through 2008, a significant amount of which appears to be attributable to Defendants' Rail Fuel Surcharges.

8.      Plaintiff seeks damages for excessive rates imposed as a result of Defendants' conspiracy on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.  Plaintiff does not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

9.      Plaintiff Ascend Performance Materials Operations LLC, formerly known as Ascend Performance Materials LLC ("Plaintiff"), is a Delaware limited liability company with its principal place of business in Houston, Texas.  Plaintiff, through its predecessor-in-interest, Solutia Inc., purchased unregulated rail freight transportation services from Defendants during the 2003 through 2008 conspiracy period.  During 2003 through 2008, one or more of the Defendants assessed Rail Fuel Surcharges on Plaintiff in connection with that unregulated rail freight transportation.  The prices Plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Plaintiff would have paid absent the conspiracy alleged herein.  Plaintiff has been injured in its business and property as a result of Defendants' antitrust violations.

10.      Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202.  CSX is a major freight railroad operating primarily in the eastern United States and Canada.  CSX has railway lines throughout the eastern United States, and it maintains coordinated schedules with other rail carriers to handle freight to and from other

parts of the country (including in this District).

11.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States.  NS has railway lines throughout the eastern United States, and it maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

12.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is a major freight railroad operating primarily in the western United States.  BNSF has railway lines throughout the western United States, and it maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

13.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is a major freight railroad operating primarily in the western United States.  UP has railway lines throughout the western United States, and it maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

## JURISDICTION AND VENUE

14.     Plaintiff brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages as well as reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiff because of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15.     This Court has jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

16.     Venue is proper in this judicial District under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391.  During the period of Defendants' conspiracy, one or more of the Defendants resided, transacted business, were found, or had agents in this District.  A substantial part of the events giving rise to Plaintiff's claims occurred in this District.  A substantial portion of the affected interstate trade and commerce described below took place in this District.

17.     This Court has personal jurisdiction over each Defendant because each Defendant

transacted business in this District, directly or indirectly marketed, sold and delivered rail transportation services in this District, has substantial aggregate contacts with this District, and engaged in an illegal price fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this District.

### INTERSTATE TRADE AND COMMERCE

18.     Defendants' unlawful activities had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

19.     During the period of the conspiracy, Defendants accounted for over 90% of all rail shipments within the United States.

20.     The activities of Defendants and their co-conspirators were within the flow of and substantially affected interstate commerce.  Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States.  Defendants used instrumentalities of interstate commerce to sell and market rail freight transportation services.

### DEREGULATION OF THE RAILROAD INDUSTRY

21.     Congress deregulated the railroad industry when it passed the Staggers Rail Act of 1980 ("Staggers Act").   The Staggers Act caused a dramatic change in the evolution of U.S. railroads.  After decades of regulatory control over virtually every aspect of railroads' economic operations, the Staggers Act freed the railroads to set market rates for rail freight transportation.

22.     Before the Staggers Act, freight railroads generally would only charge the published tariff rates that the railroads filed with the U.S. government's Interstate Commerce Commission.  During this pre-Staggers Act time period, railroads could apply to the Interstate Commerce Commission for across-the-board rate increases which could then lawfully be implemented on a collective basis.

23.     After passage of the Staggers Act, by contrast, more than 75% of all rail shipments move under private transportation contracts that are not rate-regulated or that otherwise are exempt from rate regulation.  For this rate-unregulated traffic, the railroads cannot turn to an agency to obtain across-the-board increases in freight rates and cannot lawfully collude to set those rates.

**COMPLAINT**                                                                Page 5 of 21

24.      The railroad industry also became highly concentrated with the four defendant railroads (BNSF, UP, CSX, NS) operating over 90% of all railroad track in the U.S. and accounting for approximately 94% of all rail freight revenue.   Because there are high fixed costs and significant barriers to entry in the railroad industry, there is only a fringe or niche market of smaller carriers and these carriers provide only negligible competition.   This combination of a highly concentrated market protected by high barriers to entry provided Defendants with an environment conducive to anti-competitive conduct and collusive pricing.

25.      Congress deregulated the railroad industry in large part to try to promote competition and reduce freight rates.   But the defendant railroads took advantage of their oligopolistic industry by conspiring to collectively charge shippers supracompetitive rates.

## **DEFENDANTS INTRODUCE FUEL SURCHARGES**

26.      By the early 2000s, the railroad industry had consolidated to the point where further mergers were unlikely if not impossible.   In March 2000, in response to a proposed merger between Defendant BNSF and Canadian National Railway Co., the U.S. government's Surface Transportation Board (the successor to the Interstate Commerce Commission) imposed a moratorium on new mergers.   The Surface Transportation Board then promulgated more standards for merger review, effectively cutting off further consolidation as an avenue for revenue growth.

27.      In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase.   Due to deregulation, Defendants could no longer turn to the Interstate Commerce Commission or later to the Surface Transportation Board for across-the-board rate increases, nor could Defendants unilaterally raise rates without losing market share to their competitors.

28.      Faced with the threat of competition from one another, Defendants could not unilaterally raise prices through the use of Rail Fuel Surcharges or through other means.   As BNSF noted in a 2002 internal report, "our rail competitors do not [use fuel surcharges,] and we therefore are hard pressed to achieve it."   *See Rail Freight*, 292 F. Supp. 3d. at 103.   In a January 2003 memo, BNSF's then-Chief Marketing Officer Chuck Schultz noted that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive."

*Id.* at 104.

29.     Unlike the risk of competition amongst each other, Defendants were well protected from outside competition.  The railroad industry's significant barriers to entry—such as high fixed costs required to create and maintain railroad infrastructure—gave Defendants a large competitive advantage over potential new entrants.  Defendants' businesses were concentrated in commodities and distances over which rail is the most cost-efficient mode of transportation, significantly reducing the risk of competition from non-railroad competitors.

30.     Defendants were protected from the threat of competition from outsiders but were not able to raise prices unilaterally without ceding market share to each other.  The only practicable way for Defendants to increase prices across-the-board without sacrificing short-term revenues was through a uniform surcharge applied to as many customers as possible.  Under the guise of addressing rising fuel prices, Defendants colluded to create and implement the Rail Fuel Surcharges, which effectively operated as across-the-board rate increases.

31.     After passage of the Staggers Act, the railroads increasingly entered into private freight transportation contracts that included cost escalation provisions tied to the AII and the Rail Car Adjustment Factor ("RCAF"), which is based on the AII.  The AAR published both the RCAF and the AII, and both indexes included fuel costs as a factor.  The AII and RCAF weighted a number of cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses—so that the actual impact of particular cost increases (e.g., for fuel) would be reflected in the index.  The AII and RCAF would capture any actual increase in fuel costs no matter how small or large.  The indexes and the weighted factors within them were designed for this purpose.

32.     In 2003, Defendants seized upon fuel as the means to create the type of across-the-board rate increases that the railroads could no longer achieve through a regulatory process. Defendants embarked on and implemented an agreed plan to remove fuel costs from the AII (and thus from the RCAF based on the AII) so that Defendants could apply separate "fuel surcharges." Defendants controlled and dominated the AAR and conspired to cause it to publish the AIILF. This new index no longer weighted fuel against other cost factors, allowing Defendants to use the

**COMPLAINT**                                                                          Page 7 of 21

separate "fuel surcharges" to raise total freight prices by a given percentage—and that is precisely what Defendants proceeded to do.

33.     Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but Defendants applied these fuel surcharges only in isolated instances, and each Defendant had different fuel surcharge rates, reflecting among other things the differing fuel costs of each railroad.  At that time, such surcharges were the exception, and railroads widely used the AII and RCAF indexes to capture fuel costs as well as other costs.  Defendants, then acting unilaterally and without the benefit of coordination, faced difficulties forcing shippers to accept fuel surcharges due to competition.  As a result, prior to July 2003, Defendants did not consistently apply fuel surcharges to all contracts and often modified or waived fuel surcharges in exchange for base rate increases.

<b><u>DEFENDANTS' FIRST STEPS OF PRICE COLLUSION</u></b>

34.     In 2003, Defendants took a series of coordinated actions to switch to a new system that would allow the uniform, widespread use of Rail Fuel Surcharges, not merely as a cost recovery device but as a mechanism to enhance revenue.

35.     From at least the spring of 2003 and continuing through at least 2008, top executives from each Defendant met with each other regularly.  Defendants' top executives met and discussed their industry at AAR board meetings and biannual meetings of the National Freight Transportation Association.  These meetings and others among Defendants' executives provided the opportunity for discussion and, ultimately, coordination of Defendants' fuel surcharge programs.

36.     <u>Western Railroads</u>.  As early as July 2003, the two western railroads, BNSF and UP, began to coordinate their Rail Fuel Surcharges.  Prior to this time, UP had adjusted its fuel surcharge monthly based on the price of West Texas Intermediate crude oil settled in Cushing, Oklahoma ("WTI Index").  In contrast, BNSF had based its fuel surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF Index").  In or about July 2003, UP switched to the HDF Index pursuant to an agreement with BNSF.  From that point on, BNSF and UP moved in lockstep and charged the exact same Rail Fuel Surcharge percentage each month

through at least 2007.  BNSF and UP calculated these Rail Fuel Surcharges as a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for the transport job.

37.     BNSF and UP agreed to administer their HDF Index-based Rail Fuel Surcharges in precisely the same way.  If the HDF Index measured the U.S. average price of diesel fuel as equal to or lower than $1.35 per gallon, BNSF and UP did not apply a surcharge.  When the HDF Index exceeded $1.35 per gallon, BNSF and UP both applied a surcharge of 0.5% of the total base rate for every five-cent increase above $1.35 per gallon.  For example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2% of the total base rate.

38.     BNSF and UP also coordinated when they would change their fuel surcharge.  They agreed that they would apply the Rail Fuel Surcharge to shipments beginning the second calendar month after a change in the HDF Index average price calculation.  If the HDF index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments occurring in March.  BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

39.     BNSF's and UP's agreement and coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs—including using the HDF Index, setting the trigger point at $1.35 per gallon of diesel fuel, employing a 0.5% surcharge for every five-cent increase above the trigger price, and applying the surcharge in the second calendar month after the HDF Index average price had changed.

40.     UP's adoption of the same Rail Fuel Surcharge plan as BNSF in July 2003 is striking evidence of concerted conduct.  Just two months earlier, UP had announced an entirely different modification to its then-existing fuel surcharge program.  In April 2003, UP modified the trigger points it used for adjusting surcharges in its program but did not change the index it employed.  The fact that two months later UP switched indexes and began charging exactly the same surcharges as BNSF indicates that UP's switch was the result of concerted conduct with

BNSF.

41.     Even after agreeing to coordinate their fuel surcharges, BNSF and UP still faced a significant barrier to widespread use of fuel surcharges.  Most shipment contracts contained cost escalation provisions based on the AII or the RCAF, which is based on the AII.  The AII and RCAF indexes already accounted for fuel in their escalation rates and allowed Defendants to accurately recover for any increases in fuel costs no matter how high.  Defendants agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, paving the way for widespread imposition of the new fuel surcharge program in which all four Defendants could participate and from which they could enjoy excessive profits.

42.     In the fall of 2003, BNSF and UP initiated an effort to get all Defendants to agree to remove fuel costs as a factor from the AII (and thus the RCAF based on the AII) and to instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism.  Defendants agreed to create and implement coordinated fuel surcharge programs, and to enforce their agreement through a variety of means.

43.     Defendants dominated the AAR board and caused the AAR to announce in December 2003 the creation of an unprecedented new All Inclusive Index Less Fuel ("AIILF").  Per the AAR's announcement in December 2003, the new AIILF "is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component."  This announcement and the underlying decision to create the new fuel-excluded index were the product of Defendants' collective action and could not have been accomplished without the conspiracy.  The new AIILF specified the fourth quarter of 2002 as its base period.

44.     Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice.  The creation of this new index was an important, carefully-planned step that Defendants took collectively to allow implementation and continuation of their price fixing conspiracy—a conspiracy to widely impose fuel surcharges against the entire cost of rail freight transportation and thereby to obtain additional revenues far

**COMPLAINT**

beyond any actual increases in fuel costs.

45.     Never in the AAR's history had it created a cost escalation index without a fuel component.  This action was a notable departure from the established practice in the industry.

46.     <u>Eastern Railroads</u>.  Almost immediately after the announcement in December 2003 of the new All Inclusive Index Less Fuel, and pursuant to the conspiracy, the two eastern railroads, CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index.  This synchronization was part and parcel of, and flowed from, the agreements reached and implemented by Defendants in late 2003.

47.     CSX and NS agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil.  CSX and NS increased their rates by 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel.  For example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2%.

48.     CSX and NS also adopted the same fuel surcharge price timing used by BNSF and UP.  Like BNSF and UP in the west, CSX and NS in the east changed their fuel surcharges two calendar months after the WTI Index had adjusted.  If the WTI average price exceeded $23 per barrel in January, the eastern railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply exactly the same fuel surcharge percentage month after month.  Like BNSF and UP, CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

49.     CSX's and NS's agreement and coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs—including using the WTI Index, setting the trigger point at $23 per barrel, employing a 0.4% surcharge for every $1 increase above the trigger price, and applying the surcharge in the second calendar month after the average price of WTI oil had changed.

50.     After the conspiratorial publication of the AIILF, Defendants began to apply Rail Fuel Surcharges as a separate item on shippers' bills.  Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues in an across-the-board manner.  While

facially different, the WTI-based Rail Fuel Surcharges employed by CSX and NS in the east, and the HDF-based Rail Fuel Surcharges employed by BNSF and UP in the west, in practice produced nearly identical rate escalations.

51.     There was no legitimate business justification or natural explanation for the collective action of Defendants to cause the AAR to adopt and publish the AIILF or collectively to adopt rate-based Rail Fuel Surcharges.  Such "revenue-based" fuel surcharges bore no direct relationship to Defendants' actual increase in fuel costs.  The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes.  The AII and RCAF both included a fuel cost component, and Defendants had used these indices for decades to measure fuel-cost increases.  As an empirical matter, the fuel component of the AII and RCAF would have permitted Defendants to recover all of their increased fuel costs throughout the conspiracy period.  As a result, Defendants' motivation in collectively causing the adoption of the AIILF could not have been to obtain more accurate or more efficient fuel cost recovery.  Nor were Defendants' actions independent responses to any common problem of increasing or unrecovered fuel costs.

52.     The creation and publication of a cost escalation index without a fuel component was not mandated by any regulatory body and was not necessary for any Defendant to institute its own individual fuel surcharge program.  Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action of Defendants to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges that bore no relationship to actual fuel costs.

53.     As a result of the concerted action among Defendants, prices of Rail Fuel Surcharges charged to rail shippers and customers like Plaintiff were raised to or maintained at supracompetitive levels during the conspiracy period.

## THE RAIL FUEL SURCHARGE SCHEME

54.     Defendants agreed in 2003 to remove fuel from the AII and RCAF.  This allowed Defendants to apply separate Rail Fuel Surcharges as a percentage-multiplier on the total base rate

for the rail freight transportation.  These Rail Fuel Surcharges operated as an effective across-the-board rate increase, raising revenue far beyond the actual costs of fuel (which could have been accurately recovered through the AII and RCAF).  Defendants applied these surcharges not only to published tariff rates but to the private contracts and other traffic not subject to rate regulation under federal law—such as the unregulated rates at issue here.

55.  Pursuant to the conspiracy, BNSF and UP used the HDF Index, moved in lockstep, and charged identical Rail Fuel Surcharges on a monthly basis.  The chart below shows that BNSF's and UP's Rail Fuel Surcharge percentages for freight shipments were different and varied before July 2003 and were identical starting in July 2003.

<u>Monthly Surcharge Percentages – Western Railroads</u>

| Month | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0.0% |
| Jul-02 | 1.0% | 0.0% |
| Aug-02 | 0.0% | 0.0% |
| Sep-02 | 0.0% | 0.0% |
| Oct-02 | 1.0% | 0.0% |
| Nov-02 | 2.0% | 0.0% |
| Dec-02 | 2.5% | 0.0% |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |

<u>**COMPLAINT**</u>

| | | |
|---|---|---|
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

56.     CSX and NS also charged customers uniform monthly Rail Fuel Surcharges.  CSX and NS based their Rail Fuel Surcharges on the WTI Index.  The chart below shows that CSX's and NS's Rail Fuel Surcharge percentages for carload shipments were different and varied before March 2004 and were identical starting in March 2004 (shortly after the introduction of the AIILF) through at least June 2007.

Monthly Surcharge Percentages – Eastern Railroads

| Month | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |

**COMPLAINT**

125742415v1

| | | |
|---|---|---|
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

57.     In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel costs as a percentage of operating costs and fuel efficiency differed widely among Defendants.  Collusion is the only rational explanation for Defendants in both the east and the west having identical Rail Fuel Surcharges percentages month after month for over three years.  The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges.  The advance announcement of each Defendant's Rail Fuel Surcharge rate was an important implementation and

**COMPLAINT**

enforcement mechanism for the conspiracy.

58.     Defendants' use of Rail Fuel Surcharges tied to a percentage of the total base rate rather than the actual cost of fuel allowed them to over-recover their actual fuel costs.

59.     Defendants' Rail Fuel Surcharges were also not aligned with Defendants' actual fuel costs because the surcharge rates did not account for Defendants' improvements in fuel efficiency.  By calculating fuel surcharges as a percentage of the base shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

60.     Defendants' uniform pricing only could have been achieved through an express agreement followed by collective action decoupling fuel prices from the historical cost indexes and agreeing to follow new, uniform programs for imposing stand-alone fuel surcharges. Defendants' purpose was to use increasing fuel costs as a pretext for implementing what were, in effect, across-the-board rate increases.

61.     Defendants' behavior in implementing their uniform Rail Fuel Surcharge programs advanced their collusive interest, and was inconsistent with Defendants individually pursuing their independent, unilateral self-interest.  In a competitive environment free of collusion, carriers with lower fuel costs could impose a lower surcharge and increase market share at the expense of competing railroads.  Similarly, if a competitor increased their surcharge prices, another carrier could maintain its current prices and attract market share away from its now-higher-priced competitor.  Defendants did not engage in such competitive behavior and instead adhered to a collusive, industrywide pattern of uniform fuel surcharge pricing based on the total base rate of the shipment.

## OTHER ELEMENTS OF THE CONSPIRACY

62.     At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, Defendants took additional steps to further the conspiracy.  First, Defendants began publishing their Rail Fuel Surcharges publicly on their websites, facilitating detection of any deviations from the collusive pricing.

63.     Second, Defendants largely switched from offering long-term contracts to offering contracts that were "re-priced" as often as monthly.  Prior to the conspiracy, Defendants had

allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.  This switch allowed Defendants to quickly adjust pricing if they observed any defection.

64.     Defendants made this switch away from long-term contracts even though most shippers preferred the former system as a means to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume these greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should in turn promote competition among carriers for their business.  Instead, each of the Defendants raised their prices and did not offer any compensation to customers for assuming the additional risk of short-term contracts.  Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts.  Defendants collectively refused to offer long-term contracts and took no steps (other than their mutual conspiracy) to minimize their own risks from fluctuations in demand.

65.     Third, in furtherance of the conspiracy, Defendants declined to negotiate individual discounts on the Rail Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for Defendants at least to entertain such negotiations.  Shippers from many industries, some with significant economic power, tried to negotiate their fuel surcharge percentages, but were now told by Defendants that the Rail Fuel Surcharges were "not negotiable." In December 2002, before the conspiracy began, rail customer U.S. Magnesium negotiated out of the application of a fuel surcharge with UP.  *Rail Freight*, 292 F. Supp. 3d. at 100.  One short year later, after the conspiracy had begun, U.S. Magnesium was unable to do so because UP refused— U.S. Magnesium was informed that "all contracts without fuel language will have fuel language upon renewal.  This is a mandate by UP management."  *Id.*

66.     NS's Vice President David Lawson admitted that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible."  *Id.* at 104.  BNSF's Chief Economist Sam Kyei emailed BNSF's Chief Marketing Officer John Lanigan and explained that contracts requiring the CEO's signature "but excluding full fuel surcharge provisions [would] not

be signed." *Id.*  This lack of negotiation aided Defendants in standardizing pricing along the lines of their collusive agreement and made monitoring pricing among the co- conspirators easier.

67.     Fourth, in furtherance of the conspiracy, Defendants decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the terminating railroad for routes involving more than one railroad.  Where a shipment required movement on more than one railroad, Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment.  Defendants made this change, which could only result from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

68.     Fifth, in furtherance of the conspiracy, Defendants agreed that none of them would undercut agreed pricing or "steal" market share by using their increased revenues to subsidize discounting of their underlying rates.  Defendants' market shares remained stable following the 2003 agreements.

## DEFENDANTS' SUPRACOMPETITIVE PROFITS

69.     Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy.  Through their agreement to coordinate on Rail Fuel Surcharges, Defendants realized billions of dollars in revenues in excess of their actual fuel costs.  Defendants obtained these supracompetitive profits at the expense of Plaintiff and the other customers on whom Defendants imposed their surcharges during the conspiracy period.

70.     Defendants reported increased revenues attributable to fuel surcharges in their public filings during the conspiracy.

71.     During the period of the conspiracy from July 2003 through at least December 2008, Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion.  These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy.

72.     Because of Defendants' unlawful conduct, the Rail Fuel Surcharges Defendants charged Plaintiff for unregulated rail freight transportation were fixed or stabilized at

supracompetitive levels.  Defendants' conspiracy deprived Plaintiff of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation and unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid in the United States for unregulated rail freight transportation.  These effects began in 2003 and persisted through at least 2008.

73.     Plaintiff sustained injury to its business or property as a direct result of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act.  Plaintiff was injured by paying supracompetitive prices applied to unregulated rail freight transportation throughout the U.S. as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade.  The federal laws were designed to punish and prevent the type of antitrust injury that Plaintiff suffered here.

## COUNT I

### Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

74.     Plaintiff incorporates the allegations in the paragraphs above.

75.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

76.     The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

77.     Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of and substantially affected interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements between Defendants.

78.     Defendants' contract, combination, or conspiracy has had at least the following

effects:

    a.    Prices Defendants charged Plaintiff for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

    b.    Defendants' conduct deprived Plaintiff of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

    c.    Defendants' conduct unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid for, customers of, and territories for rail freight transportation services.

79.    As a proximate result of Defendants' unlawful conduct, Plaintiff suffered injury in that it paid supracompetitive prices for unregulated rail freight transportation services.

## PRAYER

Plaintiff is entitled to relief and respectfully requests that:

(1)    this Court adjudicate and decree that the unlawful contract, combination, and conspiracy alleged in Count I was an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

(2)    Plaintiff recover compensatory damages as provided by law and that this Court enter judgment against Defendants on behalf of Plaintiff;

(3)    this Court permanently enjoin and restrain each Defendant's respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, from continuing or maintaining the combination, conspiracy, or agreement at issue in this case;

(4)    Plaintiff recover treble damages as provided by law;

(5)    Plaintiff recover the costs of the suit, including attorneys' fees and expenses, as provided by law; and

(6)    Plaintiff recover such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

In accordance with FRCP 38(a), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:   December 23, 2020

Respectfully submitted,

By: _David C. Kent_____
    DAVID C. KENT
    ATTORNEY-IN-CHARGE
    Texas State Bar No. 11316400
    Southern District No. 9006
    david.kent@faegredrinker.com

FAEGRE DRINKER BIDDLE & REATH LLP
1717 Main Street, Suite 5400
Dallas, Texas 75201
Tel:    (469) 357-2500
Fax:    (469) 327-0860

OF COUNSEL:
George T. Caplan (CA #043821)
george.caplan@faegredrinker.com
Kristopher S. Davis (CA #193452)
kristopher.davis@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel:    (310) 203-4000
Fax:    (310) 229-1285

William L. Roberts (MN # 0212763)
william.roberts@faegredrinker.com
Jonathan W. Dettmann (MN # 0265032)
jon.dettmann@faegredrinker.com
Craig S. Coleman (MN # 0325491)
craig.coleman@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel:    (612) 766-7000
Fax:    (612) 766-1600

*Attorneys for Plaintiff*
*ASCEND PERFORMANCE MATERIALS*
*OPERATIONS LLC*

125742415v1